## UNITED STATES

v.

**Airman Mickel R. GREENE, FR 227–82–9180 United States Air Force.**

**ACM 23204.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 1 April 1981.

Decided 6 Jan. 1982.

---

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Alexander S. Nicholas.

Appellate Counsel for the United States: Colonel James P. Porter and Lieutenant Colonel Bruce R. Houston.

Before POWELL, KASTL and MAHONEY Appellate Military Judges.

## DECISION

POWELL, Senior Judge:

A general court-martial, consisting of a military judge alone, convicted the accused of indecent assault, a violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.[1] The approved sentence is a bad conduct discharge, confinement at hard labor for six months, forfeiture of $150.00 per month for 12 months and reduction to airman basic.

1. The accused was acquitted of the offense of abduction of the victim of the indecent assault which was alleged to have occurred on the same date as the assault.

During the midnight to early morning hours of 24–25 September 1980, when Mrs. G and her cousin, Mrs. H, were returning home after an evening at the base Noncommissioned Officers' Club, they encountered the accused in his parked car near Mrs. G's on-base residence. Stating that he wished to talk, the accused invited Mrs. G to sit in his car which she did, leaving the car door partially open. When the front door of the house opened and Mrs. H warned that someone was coming out, the accused closed the car door and drove off with Mrs. G inside. As the car neared a street corner, Mrs. G yelled to Mrs. H, "Get G".

Mrs. G insisted that the accused take her home but, while telling her to relax and stay calm, the accused drove to his barracks. There the accused got out of the car and although he told her to get out also, Mrs. G remained in the car. When the accused exchanged greetings with a military taxi driver who happened by, Mrs. G asked to be taken home but the driver thought that she was addressing the accused and left without Mrs. G. The accused grabbed Mrs. G's wrist, pulled her out of the car and took her to his barracks room. From the car to the room, Mrs. G yelled for help and attempted to prevent going into the room by holding onto a nearby stairway railing. The accused forced her to release the railing and pushed her into the room. Once inside the room, the accused reached for Mrs. G and ripped the fur jacket she was wearing. To this, Mrs. G remarked: "If you want me to take my clothes off, I'd rather take my clothes off than have you tear them off."

According to Mrs. G's testimony, when she attempted to leave the room, a violent struggle ensued. While they exchanged blows and wrestled around the room, she continued to yell for help. When their combat landed them upon the bed, the accused held her down on her back with her right arm pinned behind her. He then proceeded to remove her clothing which consisted of brown satin slacks, a brown long-sleeved stretch nylon one-piece bodysuit and a pair of four-inch strapped platform heels. After her slacks were removed, the bodysuit was taken off her left arm and pulled down to the waist. By bracing his chin on her chest and resting his body on top of her, the accused was able to remove the suit. Her clothing was pulled down and off over her shoes which remained on her feet. The accused, who had shed his trousers, then started kissing Mrs. G's neck, fondling her breasts and touching her thighs and vaginal area with his penis. Becoming either discouraged or fatigued by the struggle, the accused told her to get dressed and leave. Mrs. G put on her clothes, left the room and went out into a street where she flagged down a passing car. Upon recognizing the driver, Mrs. G complained that the accused had tried to rape her.

Soon thereafter, an investigation was initiated and in a search of the accused's room, several items of jewelry worn by Mrs. G that evening were found. One of her earrings was located in the mattress frame of the bed, beads which were worn at the end of braids in her hair were found under the bed, and her watch was discovered on the floor in folds of the bedspread.

Mrs. G testified that when she got home after the alleged assault, she examined the slacks, bodysuit and shoes. There were no rips or tears in any of the clothing items but she saw faint new scuff marks on the shoes. She admitted that in prior testimony at the Article 32, 10 U.S.C. § 832 investigation, she misled authorities by denying her conviction as an accomplice to wrongful sale of cocaine and petty theft offenses for which she had served time in jail. She further conceded that she had not truthfully disclosed either how long she had known the accused or the fact that approximately two years before the assault, she had willingly engaged in sexual intercourse with him.

■ Prior to trial, the defense counsel examined the slacks, bodysuit and shoes; however, by the time of trial, these items were lost, missing or otherwise unavailable

to the defense.[2] Over defense objection, Mrs. G identified other items of her clothing as similar to the lost ones. She presented slacks and another bodysuit made from similar stretch material but which was short-sleeved rather than long-sleeved.[3]

 Appellate defense counsel claim that the military judge incorrectly denied the defense's motion to dismiss the specification and charge based on the government's destruction of evidence favorable to the accused. We disagree and find the military judge's ruling correct.

In resolving this issue in this case, we find the concurring opinion in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979), definitive and persuasive. We accept the judicial technique of balancing the "quality of the Government's conduct" against the "degree of prejudice to the accused" as the test most appropriate to reconciling competing interests in situations where evidence is lost or destroyed while in Government custody. *United States v. Tercero*, 640 F.2d 190 (9th Cir. 1980). Special circumstances indicating that the Government's action is so culpable or the prejudice to the accused is so severe as to question judicial integrity or dictate a need to deter future violations may require more direct remedial action. However, we specifically reject any contention that dismissal of criminal charges should automatically result from a mere showing that the Government may have been responsible for the loss of relevant evidence. The factors constituting the respective sides of the equation are set out in *Loud Hawk* and repeated in *Tercero*. The inquiry into the Government's conduct should include:

whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification.... It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused.

*United States v. Tercero, supra,* at 192. In assessing prejudice to the accused, consider:

the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*United States v. Tercero, supra,* at 192.

While the record does not fully explore the circumstances of the Government's conduct with respect to the loss of the slacks, bodysuit and shoes, there was no real contention of bad faith, evil design or culpable negligence on the part of any person acting on behalf of the Government. There was no showing that anyone deliberately or intentionally engaged in conduct in furtherance of a motivation to specifically harm

---

2. Although not proven by evidence properly before the military judge, we glean from the record that the items were retained in government custody in the office of the base staff judge advocate, who innocently or inadvertently discarded them. Counsel agreed that the items were unavailable and the defense did not contend that the government had willfully suppressed the evidence.

3. These items, offered for demonstrative purposes, were not admitted in evidence. There was no in-court reenactment of their removal. We perceive no prejudice from their mere presentation in this judge alone trial, but we do wish to emphasize that prejudice may result from in-court demonstrations involving evidence not directly related to the accused's case. *United States v. Pjecha,* 7 M.J. 455 (C.M.A. 1979).

the accused. We are satisfied that the Government's actions in this case do not challenge judicial integrity or threaten repeated violations.

■ Turning to the matter of prejudice to the accused, we find that the condition of the slacks, bodysuit and shoes was not central to the case. The victim of the offense testified that her inspection of the clothing a few hours after the assault disclosed that the items were not damaged in any significant respect as a result either of being worn or forceably removed during the struggle. The defense presented evidence showing that the clothing may have been actually taken off by the victim and the very limited rebuttal by the Government concerned whether, contrary to her testimony in court, the victim had stated previously that she had, in fact, removed her clothes. Even if the victim removed the clothing but did so under duress or fear generated by the accused, the offense would not be excused. We conclude that the military judge, as factfinder in this case, was aware of the dissimilar nature and shortcomings of the demonstrative clothing items and kept the question of prejudice to the accused in proper alignment with the testimony of the victim that the clothing was not damaged. This dissipation of any prejudice supports the military judge's ruling on the motion to dismiss.

■ The defense's remaining assignment of error challenging the specification for failure to allege that the victim of the assault was not the wife of the accused is resolved adversely to the accused. The accused was adequately informed of the exact nature of the offense. The required proof, that the victim was not the wife of the accused at the time of the assault, did not in any way surprise or hamper the accused in the preparation or presentation of his defense.

The findings of guilty and the sentence are

AFFIRMED.

KASTL and MAHONEY, Judges, concur.